UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

<table>
<tr><td>TERRY HEAD,<br><br>        Plaintiff,<br><br>   v.<br><br>COSTCO WHOLESALE CORPORATION,<br><br>        Defendant.</td><td>Case No. 24-cv-01203-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Docket No. 27</td></tr>
</table>

Plaintiff Terry Head has filed an employment discrimination and wage-and-hours case against his former employer, Costco Wholesale Corp. Mr. Head was an employee of Costco from 1993 to 2022. For most of the employment period, he was an hourly sales employee. Beginning on March 15, 2021, and lasting until June 30, 2022, when his employment with Costco ended, Mr. Head was on continuous leave from employment, either because of his wife's medical condition (cancer) or because of his own. Mr. Head claims that he was forced to resign (*i.e.*, effectively terminated) after Costco refused to accommodate his need to take care of his sick wife. Costco claims that Mr. Head voluntarily resigned. When Mr. Head asked to be rehired in 2024, Costco declined. Now pending before the Court is Costco's motion for summary judgment.

Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part Costco's motion for summary judgment.

## I.     FACTUAL & PROCEDURAL BACKGROUND

Mr. Head is in his late sixties. *See* Compl. ¶ 15. He worked for Costco for almost thirty years, from about October 1993 until June 2022. *See* Head Depo. at 13, 202. For most of the

1    employment period, he was a sales employee and paid on an hourly basis.[1]  *See* Compl. ¶ 14.

2        Mr. Head asserts two categories of claims against Costco: (1) employment discrimination

3    claims and (2) wage-and-hour claims.

4        The employment discrimination claims can generally be broken into two subcategories: (a)

5    Costco retaliated against Mr. Head for having been a named plaintiff in a wage-and-hour class

6    action against the company (filed back in 2001 and settled in 2009) and then for subsequently

7    promoting employees' wage-and-hour rights; and (b) Costco discriminated against Mr. Head, and

8    failed to accommodate him, on the basis of his wife's disability.  For both the claims in

9    subcategories (a) and (b), Mr. Head asserts the same adverse employment actions.  They are as

10   follows:

    (i)     Costco fabricated issues with respect to Mr. Head's work performance – in

11            particular, issuing employee counseling notices that were not warranted.

12

13   (ii)    Costco denied requests made by Mr. Head to transfer to a store closer to his

14            home so that he could take care of his sick wife.

15   (iii)   Costco constructively terminated Mr. Head (forced him to resign) instead of

16            accommodating his need to take care of his wife.

17   (iv)    After Mr. Head's wife passed away, Costco refused to rehire him.

18   A.   Protected Activity and Protected Status

19        As indicated above, the employment discrimination claims are founded on (a) protected

20   activity and (b) protected status.

21        1.   Protected Activity

22        The protected activity (as alleged by Mr. Head) was as follows.

23        In 2001, Mr. Head was a named plaintiff in a class action suit against Costco which alleged

24   a number of wage-and-hour violations.  *See* Head Decl. ¶ 9; Head Depo. at 10.  The suit

25   eventually settled in 2009.  *See* Compl. ¶ 18.

26   _____

27   [1] At one point during his employment with Costco, Mr. Head was promoted to Food Court
     Manager but, in 2001, he was transitioned to an hourly sales employee.  *See* Head Depo. at 59-60.

28   Mr. Head does not seem to be claiming, as part of his lawsuit, an unlawful demotion by Costco.

United States District Court
Northern District of California

United States District Court
Northern District of California

Following the settlement, Mr. Head continued to monitor whether Costco engaged in wage-and-hour violations. For example, he "requested periodic manual checks of his payroll records for wage adjustments." Compl. ¶ 19. He also encouraged other employees to ensure that their rights were not being violated. *See* Head Decl. ¶ 9 (testifying that he "assisted and encouraged other employees to review their time and pay for accuracy and to go to Costco leadership when met with resistance by their managers").

     2.   <u>Protected Status</u>

The protected status (as alleged) largely relates to the disability of Mr. Head's wife. In 2014, Mr. Head's wife was diagnosed with cancer. *See* Head Depo. at 35. She passed away in April 2023. *See* Head Depo. at 8.

Under Costco's Employee Agreement, there are two types of leaves of absence: (1) personal medical leave and (2) family medical leave (under federal and state law, *i.e.*, FMLA and CFRA). *See* Rajski Decl., Ex. B (Employee Agreement § 7.0). The Employee Agreement states that "[t]he maximum total time allowed for approved Costco Personal Medical Leave, continuous FMLA/state law leave for any reason, and Personal Leave **combined** is 12 months, except as required by law." *Id.* (emphasis added) The agreement also states that, "[s]ubject to applicable law, your employment may be terminated if you fail to return to work on or before the expiration of your leave." *Id.*

Beginning in June 2015, Mr. Head began to take intermittent leave to care for his wife. *See, e.g.*, Head Depo., Exs. 30-33 (FMLA forms, covering certain periods in 2015-2018).

Then, in late 2020, Mr. Head took a brief period of continuous leave to care for his wife.

Thereafter, from March 15, 2021, to June 30, 2022 (*i.e.*, the date of Mr. Head's termination/resignation), Mr. Head was out on continuous leave, either because of his wife's medical condition *or* because of his own. *See* Rajski Decl., Ex. C (punch records). *See, e.g.*, Head Depo., Ex. 17 (FMLA form, covering period 3/15/2021 to 6/15/2021) (available at Docket No. 271 (ECF Page 141)). Specifically:

- From March 15 to June 15, 2021, Mr. Head was on continuous leave to care for his wife. This, apparently, exhausted his FMLA/CFRA leave.

- From June 15, 2021, to February 2022, Mr. Head was on continuous leave for his own serious health condition.  *See* Head Depo., Ex. 18 (request for Personal Medical Leave) (available at Docket No. 27-1 (ECF Page 146)).

- From February 2022 to May 7, 2022, Mr. Head was again on continuous leave for his own serious health condition.  *See* Head Depo., Ex. 21 (doctor's note) (available at Docket No. 27-1 (ECF Page 153)); Head Depo., Ex. 22 (letter) (available at Docket No. 27-1 (ECF Page 154).  Notably, he had previously asked to take continuous leave through February 2023 because of his *wife's* condition but was told that he was not eligible for FMLA/CFRA because he had not worked the required hours in the prior year.  *See* Maldanado Depo., Ex. B (FLMA form, covering period 2/15/2022 to 2/14/2023) (available at Docket No. 27-1) (ECF Page 259)); *see also* Head Depo., Ex. 23 (letter) (available at Docket No. 27-1 (ECF Page 156) (referring to a request made for leave from 2/2022 through 2/14/2023).  In April 2022, Mr. Head informed Costco that he was now able to work but that he needed to remain off work for the rest of 2022 because of his wife's medical condition.  *See* Head Depo., Ex. 23 (letter) (available at Docket No. 27-1 (ECF Page 156)); Head Depo., Ex. 24 (doctor's note) (available at Docket No. 27-1 (ECF Page 157)).

- From May 8, 2022, to June 30, 2022, Mr. Head did not return to work because of his wife's medical condition.  Mr. Head maintains that he was terminated (forced to resign) because Costco told him that he had exhausted the leave available to him under company policy and that he was not eligible for additional FMLA/CFRA leave in order to care for his wife.  *See* Head Depo., Ex. 27 (letter) (available at Docket No. 27-1 (ECF Page 158)).  Mr. Head testified in his deposition that he felt he had no choice but to resign, especially if he wanted to come back to work for Costco in the future.  *See* Head Depo. at 206, 208; *see also* Rajski Depo. at 55 (testifying that a person would likely want to resign; "[o]therwise, they stop showing up to work and then it's treated as job abandonment and they would be

4

terminated").

B.    Adverse Employment Actions

As noted above, Mr. Head asserts that was retaliated against because of his protected activity and further discriminated against, and not accommodated, on the basis of his wife's disability.  The main adverse employment actions (as alleged by Mr. Head) are described below.

1.    Employee Counseling Notices

Based on the record submitted, it appears that fifteen employee counseling notices were issued to Mr. Head – specifically, in June 2003, August 2003, June 2006, March 2007, August 2007, July 2010, January 2012, December 2012, September 2015, April 2016, September 2016, October 2017, December 2017, June 2018, and June 2020.  *See generally* Brotman Decl., Ex. B (employee counseling notices).

According to Mr. Head, many of the notices should not have been in his personnel file, either because they were unwarranted or because they were not intended to be permanent documents in his file (*i.e.*, as stated on the face of the document).  *See, e.g.*, Head Depo. at 66-67, 84, 91-92, 124, 166; Maldonado Depo. at 91-92; *see also* Opp'n at 2.  Examples of the former include the following:

- In April 2016, Mr. Head was issued an employee counseling notice by Lamar Bell, the general manager of the Livermore store.  According to Mr. Head, Mr. Bell was the mentee of Melissa McCurdy,[2] who had been Mr. Head's supervisor back in 2001 when the class action that Mr. Head participated in was filed against Costco.  *See* Compl. ¶ 29; Head Depo. at 62 (testifying that Ms. McCurdy helped Mr. Bell get the manager position at the Livermore store).  Mr. Bell suspended Mr. Head for three days without pay – specifically, on the basis that Mr. Head went back to the break room for 11 minutes even though he had already clocked in after coming back from lunch.  *See* Brotman Decl., Ex. B (employee counseling notice, dated 4/12/2016).  According to Mr. Head, the counseling notice was not justified: he

---

[2] Costco disputes such.  *See, e.g.*, Bell Depo. at 15-16 (testifying that he did not have a close relationship with Ms. McCurdy and that the relationship was professional).

United States District Court
Northern District of California

went back to the break room only because he was instructed to ice his back after suffering a workplace injury.[3]

- In December 2017, Mr. Head was issued an employee counseling notice by Denise Zizzo, the general manager of the Modesto store. Ms. Zizzo claimed that Mr. Head had made a mistake in labeling the price of the jewelry (resulting in a loss to Costco of $170), but, according to Mr. Head, the mistake was in fact made by another employee, well before he transferred to the Modesto store.

- In June 2018, Mr. Head was issued an employee counseling notice for parking in the Costco member parking lot instead of the lot for employees. Mr. Head maintains that the notice was inappropriate because he needed to park in a handicapped spot (and he had a handicap placard that allowed him to use the spot).

### 2.    Requests to Transfer Stores

According to Mr. Head, Costco also took adverse employment actions against him by repeatedly denying his requests to transfer stores.

In October 2015, Mr. Head asked, for the first time, for a transfer from the Livermore store (where he worked) to a different store so that he could work closer to home to care for his wife. *See* Brotman Decl., Ex. E (transfer requests). Manteca was only 5-10 minutes from his home, and Tracy 30 minutes. *See* Compl. ¶ 22. Mr. Head was told there were no available positions in Manteca because they were fully staffed for the holidays. *See* Head Depo., Ex. 4 (email from S. Chamberlain stating, "Unfortunately we do not have any room. We are not planning to hire any seasonal employee's [sic] for the holidays") (available at Docket No. 27-1 (ECF Page 132)).

Several months later, in or about January 2016, Mr. Head again asked to be transferred to a Costco location closer to his home so that he could more easily care for his sick wife. *See*

---

[3] Mr. Head indicates that this was just one example of "bullying" by Mr. Bell. Mr. Head asserts that the bullying by Mr. Bell was so extreme that, in May 2016, an anonymous complaint was filed against Mr. Bell based on his harassment of Mr. Head. *See* Brotman Decl., Ex. G (anonymous complaint, made in May 2016); *see also* Brotman Decl., Ex. H (email from Mr. Head to a Costco higher-up, dated May 2016) (identifying misconduct by Mr. Bell). Apparently, Costco investigated but determined that there was no unfair treatment or violation of company policy. *See* Brotman Decl., Ex. I.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Brotman Decl., Ex. E (transfer requests).  Costco denied the transfer request as well as additional

2  transfer requests made in April 2016, August 2016, and May 2017.  *See* Brotman Decl., Ex. E

3  (transfer requests).  According to Costco, there were no open positions available at the transferee

4  locations.

5       Mr. Head maintains that, with respect to each denial, Costco could have made room for

6  him if it had wanted to do so.  In support, he relies on the deposition of Mr. Bell.  During his

7  deposition, Mr. Bell testified that general managers have discretion to create or not create space at

8  a warehouse for a transfer, but "[y]ou should be doing what's best for the business."  Bell Depo. at

9  52.  He explained:

10      Do I have the discretion [to make space for a transfer]?  I would
    want to do what's best for the business.  So, you know, obviously

11      I'm not going to blow payroll numbers to do that.  If I don't have the
    payroll at the time, I may not do it.  If I – if I have a need, you know,

12      I'll try to get it done as quick as possible.

13  Bell Depo. at 51.  In other words, "[t]here are times when I'm able to do that, and there are times

14  when I'm not able to make this space."  Bell Depo. at 50-51.  "[I]f its our slowest time of the year,

15  it's probably not an easy time to transfer.  You know, if you're – if it's Black Friday, you know, I

16  can use all hands on deck in that situation.  Bell Depo. at 53.

17      In November 2017, Costco finally approved a transfer request.  Mr. Head was transferred

18  to the Modesto store (30 minutes away from his home).  *See* Compl. ¶ 24.  However, Mr. Head

19  asserts that Costco continued to discriminate and/or retaliate against him.  For example, when Mr.

20  Head started working at the Modesto store, Denise Zizzo (the manager of the Modesto store)

21  allegedly singled him out for criticism and nitpicked his work performance.  On one occasion, she

22  falsely accused Mr. Head of mispricing jewelry when, in fact, that mistake had been made by a

23  different employee "months before [Mr. Head] even began working at the Modesto location."

24  Compl. ¶ 27; *see also* Head Depo. at 84.  As noted above, this was the subject of one of the

25  employee counseling notices.[4]

26  _____

27  [4] It appears that, at one point, Mr. Head took issue with another action by Ms. Zizzo.  Specifically,
in November 2017, shortly before the transfer to the Modesto store, Ms. Zizzo told Mr. Head:

28  "We will accept your transfer [to Modesto] with the understanding that you will lose your
seniority for 6 months and with the understanding that you are not grandfathered in to any future

1    According to Mr. Head, because of the mistreatment, he asked to be transferred back to

2    Livermore in December 2017 (just three weeks after he started at the Modesto store). The request

3    was approved, and Mr. Head went back to the Livermore store the next day. *See* Compl. ¶ 28

4        3.    Termination/Resignation

5    As indicated above, Mr. Head was allegedly terminated (forced to resign) on June 30,

6    2022. This was after he had been on continuous leave, either for his wife's health or his own since

7    March 15, 2021.

8    The events leading to the termination/resignation were as follows.

9    Mr. Head was first been out on continuous leave from March 15, 2021, to June 15, 2021,

10   because of his wife's medical condition. This apparently exhausted his FMLA/CFRA leave.

11   Mr. Head, however, did not return to work because he obtained approval for personal

12   medical leave (continuous) from June 15, 2021, through February 2022.

13   On February 1, 2022, while Mr. Head was still on leave for his own health condition,

14   Costco sent him a letter informing him that his leave of absence was due to expire. Costco also

15   told Mr. Head that its policy provided for a leave of absence of one year only and invited him to

16   meet with management for a Job Assessment Meeting to discuss a possible return to work. *See*

17   Head Depo., Ex. 20 (letter) (available at Docket No. 27-1 (ECF Page 152)).

18   It appears that, in response, Mr. Head submitted a request for continuous leave to care for

19   his wife through February 4, 2023. But Costco informed Mr. Head that he was not eligible for

20   FMLA or CFRA leave since he had not worked the required hours in the prior year. *See*

21   Maldonado Depo., Ex. B (FLMA form, covering period 2/15/2022 to 2/14/2023) (available at

22   Docket No. 27-1) (ECF Page 259)); *see also* Head Depo., Ex. 23 (letter) (available at Docket No.

23

24   ────────────────

schedule. Here at Modesto we write the schedule to the needs of our business." Head Depo., Ex.
25   9 (letter) (available at Docket No. 27-1 (ECF Page 137)). Costco, however, points out that Ms.
     Zizzo was simply acting in accordance with established company policy as it appeared in the
26   Employment Agreement. See Rajski Decl., Ex. A (Employment Agreement § 5.1) ("When you
     transfer to a new location, promote or demote to a new position, or move to a different department
27   including as part of a Reduction in Workforce, you agree to meet all requirements of that position,
     which include availability. In these situations, you may not use your seniority to request a
28   schedule preference for the first six months."). Mr. Head has not challenged the lawfulness of that
     policy.

United States District Court
Northern District of California

27-1 (ECF Page 156) (referring to a request made for leave from 2/2022 through 2/14/2023).

Mr. Head then submitted a medical note (dated February 7, 2022) stating that *he* had been under medical care and needed to remain off work until May 7, 2022. *See* Head Depo., Ex. 21 (doctor's note) (available at Docket No. 27-1 (ECF Page 153)).

On March 29, 2022, Costco informed Mr. Head via letter that he had been on leave since March 15, 2021, and Costco allowed for a leave of absence of up to one year only. Notwithstanding such, Costco approved the leave through May 7, 2022. Costco asked that Mr. Head provide, by May 8, 2022, medical documentation releasing him to work. *See* Head Depo., Ex. 22 (letter) (available at Docket No. 27-1 (ECF Page 154)). In its letter, Costco also stated:

> Given the circumstances including the fact that you have exhausted the leave available under Company policy if you are unable to return to work with or without accommodations after the job assessment review process described above, separation of your employment may be appropriate. In that event, you will be eligible for rehire.

Head Depo., Ex. 22.

On April 3, 2022, Mr. Head responded to Costco, indicating that he was able to work ("There is no issue of my ability to do my job!") but that he needed to remain off work ("FMLA or not") to care for his wife who had cancer. Head Depo., Ex. 23 (letter) (available at Docket No. 27-1 (ECF Page 156)). A few days later, Mr. Head submitted a medical note stating that, physically, he was able work to work but that his chronically ill wife depended on him for 24-hour care so that he was not able to return to work in 2022. *See* Head Depo., Ex. 24 (doctor's note) (available at Docket No. 27-1) (ECF Page 157)). The note also stated: "We will reassess work status in 1/1/2023." Head Depo., Ex. 24.

Mr. Head did not return to work on May 8, 2022. Thus, in June 2022, Costco sent Mr. Head a letter, advising him that he had exhausted the leave available to him under company policy and that he was not eligible for additional FMLA/CFRA leave in order to care for his wife. Because Mr. Head's doctor indicated that Mr. Head was able to work, Costco scheduled him for work starting July 5, 2022. *See* Head Depo., Ex. 27 (letter) (available at Docket No. 27-1 (ECF Page 158)). Costco added:

> Given the circumstances, if you are not able to return to work due to

United States District Court
Northern District of California

> your need to care for your spouse, and as mentioned earlier you are
> not eligible to take leave for this reason, we are giving you the
> opportunity to voluntarily resign your employment. If you would
> like to consider voluntarily resigning your employment, enclosed is
> a resignation/termination form for you to complete and sign to
> reflect your resignation. Please return the completed and signed
> form **by July 7, 2022**.
>
> You are expected to follow the call in procedures. If you fail to
> return to work as scheduled, your leave will be unauthorized and
> subject to discipline up to and including termination of employment,
> in accordance with Company Policy. If you return to work, until
> you have FMLA leave available, any future absences to care for
> your family member will be treated in accordance with Company
> policy and may be subject to discipline unless you are using
> available sick/personal time.

*Id.* (emphasis in original).

Thereafter, on June 30, 2022, Mr. Head resigned by signing the resignation/termination form. *See* Head Depo., Ex. 28 (form) (available at Docket No. 27-1 (ECF Page 160)). As noted above, Mr. Head testified in his deposition that he felt he had no choice but to resign, especially if he wanted to come back to work for Costco in the future. *See* Head Depo. at 206, 208; *see also* Rajski Depo. at 55 (testifying that a person would likely want to resign; "[o]therwise, they stop showing up to work and then it's treated as job abandonment and they would be terminated").

### 4.    Refusal to Rehire

The last adverse employment action (as alleged by Mr. Head) is Costco's refusal to rehire Mr. Head.

Mr. Head's wife passed away in April 2023. *See* Head Depo. at 8. In May 2023, Mr. Head asked Costco to reinstate him because his wife had passed and thus he was able to return to full-time employment. *See* Compl. ¶ 33. Mr. Head spoke to Vice President Drew Sakuma (one of his prior supervisors) and General Manager Mike Maldanado. The latter was new and had never worked with Mr. Head previously.

According to Mr. Head, the two said that Costco would rehire him, albeit for a part-time role until the holiday season. *See* Head Depo. at 212 ("[T]hey did say that they would bring me back part time. And then it was a holiday coming up, and then I would have the full-time status."). According to Costco, the two simply said that they would look into the possibility. *See* Maldanado Depo. at 56 ("Like I said, I think Terry was there. And I said, there's probably no

10

1    problem.  Let me look into it.  And that was it.").

2         During his deposition, Mr. Maldanado testified that he obtained Mr. Head's personnel file

3    and saw that there were employee counseling notices.  *See generally* Brotman Decl., Ex. B

4    (counseling notices).  As noted above, Mr. Head maintains that many of the notices should not

5    have been kept in his personnel file – for instance, because they were inaccurate (*e.g.*, charging

6    him with a mistake of another employee) or because they were not intended to be permanent

7    documents in his file (*e.g.*, as reflected on the face of the document).  *See, e.g.*, Head Depo. at 66-

8    67, 84, 91-92, 124, 166; Maldanado Depo. at 91-92.  Mr. Maldanado looked at about two or three

9    of the employee counseling notices (for just a few seconds) and saw that Mr. Head had refused to

10   sign them.  *See* Maldanado Depo. at 63-64, 68-69.  Although there is not a requirement that an

11   employee sign a counseling notice, Mr. Maldanado had never seen someone not sign a notice, and

12   not signing a notice indicated to him that the person was a problem employee.  *See* Maldanado

13   Depo. at 59, 61.  Mr. Maldanado told his manager, Mr. Sakuma, that he had decided against

14   rehire, and Mr. Sakuma agreed with the decision.  At the time of the decision, Mr. Maldanado

15   knew that Mr. Head's wife had died recently but did not know about the circumstances under

16   which Mr. Head's previous employment had ended.  *See* Maldanado Depo. at 52, 70-71

17   (indicating that he did not ask because he was simply following his boss's directive to look into

18   rehire).

19   C.    Causes of Action

20         Based on the above, Mr. Head has asserted a number of employment discrimination

21   claims.  He has also asserted a number of wage-and-hour claims.

22         The employment discrimination claims are found at Counts 1-8.

23         • **Count 1:** retaliation in violation of California Labor Code § 1102.5.[5]  This is a

24   _____

25   [5] Section 1102.5 provides in relevant part that

26         [a]n employer . . . shall not retaliate against an employee for
         disclosing information, or because the employer believes that the
27       employee disclosed or may disclose information, to a government or
         law enforcement agency, to a person with authority over the
28       employee or another employee who has the authority to investigate,
         discover, or correct the violation or noncompliance, or for providing

11

United States District Court
Northern District of California

whistleblower retaliation claim – *i.e.*, Mr. Head asserts that Costco retaliated against him because he had participated in a wage-and-hour class action against Costco and further advocated for employee wage-and-hour rights.

- **Count 2:** disability discrimination in violation of FEHA. This is the "associational disability" claim – *i.e.*, Mr. Head claims he was discriminated against because of his association with a disabled person (his wife).

- **Count 3:** failure to prevent, investigate, and remedy discrimination/harassment in violation of FEHA. This claim relates to the disability discrimination claim above.

- **Count 4:** failure to accommodate in violation of FEHA. As alleged, Costco failed to accommodate Mr. Head's request for time off to care for his wife.

- **Count 5:** failure to engage in the good faith interactive process in violation of FEHA. This is related to the accommodation claim.

- **Count 6:** retaliation in violation of FEHA. This is related to the accommodation claim.[6]

- **Count 7:** wrongful termination in violation of public policy. This claim is related

---

information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

Cal. Lab. Code § 1102.5(b).

[6] California Government Code § 12940(m)(2) provides that it is unlawful "[f]or an employer . . . to, in addition to the employee protections provided pursuant to subdivision (h), retaliate or otherwise discriminate against a person for requesting accommodation under this subdivision, regardless of whether the request was granted." Cal. Gov't Code § 12940(m)(2). Section 12940(h) addresses the more typical kind of retaliation claim. *See id.* § 12940(h) (providing that it is unlawful "[f]or any employer . . . to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part").

In his complaint, Mr. Head refers to retaliation under both § 12940(m)(2) and § 12940(h). *See* Compl. ¶ 93. However, the factual allegations in support of the retaliation claim show that it is ultimately founded on § 12940(m)(2). *See* Compl. ¶ 94 ("As alleged herein above, Plaintiff's requests for accommodations to care for [his] ill and disabled wife were substantial motivating reasons for Defendants' decision to terminate Plaintiff's employment").

to the FEHA claims.  *See* Compl. ¶ 101.

- **Count 8:** wrongful termination in violation of public policy.  This claim is related to the whistleblower retaliation claim.

The wage-and-hour claims are found at Counts 9-16.

- **Count 9:** failure to timely pay earned wages in violation of California Labor Code §§ 204 and 210.

- **Count 10:** failure to pay minimum wages in violation of California Labor Code §§ 1197 and 1194.

- **Count 11:** failure to pay overtime compensation in violation of California Labor Code §§ 510 and 1194.

- **Count 12:** failure to provide meal periods in violation of California Labor Code § 226.7.

- **Count 13:** failure to provide rest periods in violation of California Labor Code § 226.7.

- **Count 14:** failure to provide accurate wage statements in violation of California Labor Code § 226.

- **Count 15:** waiting time penalties in violation of California Labor Code §§ 201 and 203.

- **Count 16:** unfair business practices in violation of California Business & Professions Code § 17200.

## II.    DISCUSSION

A.    Legal Standard

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could

13

1    reasonably find for the [nonmoving party]." *Id.* at 252.  At the summary judgment stage, evidence

2    must be viewed in the light most favorable to the nonmoving party and all justifiable inferences

3    are to be drawn in the nonmovant's favor.  *See id.* at 255.

4        Where a defendant moves for summary judgment based on a claim for which the plaintiff

5    bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a

6    showing sufficient to establish the existence of an element essential to [the plaintiff's] case."

7    *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

8    B.    Count 1: Whistleblower Retaliation Claim

9        In Count 1, Mr. Head claims retaliation (including but not limited to the final act of

10    termination/resignation in June 2022) because he engaged in protected activity – *i.e.*, being a

11    named plaintiff in the wage-and-hour class action against Costco (the suit was filed in 2001 and

12    settled in 2009) and then advocating for wage-and-hour rights thereafter (the time period for this

13    advocacy is not specified).

14        1.    Statute of Limitations

15        Costco's main challenge to the retaliation claim is that it is time barred.  Mr. Head initiated

16    this lawsuit in January 2024.  His retaliation claim has a three-year statute of limitations.  *See*

17    *Minor v. FedEx Office & Print Servs.*, 182 F. Supp. 3d 966, 988 (N.D. Cal. 2016) (stating that a §

18    1102.5 claim has a three-year statute of limitations based on California Code of Civil Procedure §

19    338(a) which covers "'[a]n action upon a liability created by statute, other than a penalty or

20    forfeiture'").[7]  Thus, as a facial matter, only conduct that took place in or after January 2021

21    would fall within the limitations period.  There are only two alleged adverse employment actions

22    that took place in or after January 2021: the termination/resignation and the failure to rehire.  Mr.

23

24    _____

[7] Section 1102.5 does not have its own statute of limitations.  "California courts and federal
25    district courts are split as to whether to apply a three-year limitations period or a one-year period,"
     but three years seems to be the trend.  *Khan v. SAP Labs, LLC*, No. 8-cv-07490-BLF, 2019 U.S.
26    Dist. LEXIS 191102, at *40 (N.D. Cal. Nov. 4, 2019); *see also Newton v. Bank of Am.*, No. CV
     16-09581-AB (RAOx), 2018 U.S. Dist. LEXIS 228955, at *14 (C.D. Cal. Jan. 18, 2018)
27    (concluding that "applying a three-year statute of limitations to Labor Code § 1102.5 claims for
     damages [as opposed to a civil penalty] is appropriate given the statutory scheme and the
28    legislative intent behind the 2003 amendments to the statute").

1   Head argues, however, that Costco can still be held liable for conduct before January 2021

2   because of the continuing violations doctrine.

3          The continuing violations doctrine "allows liability for unlawful employer conduct

4   occurring *outside* the statute of limitations if it is sufficiently connected to unlawful conduct

5   *within* the limitations period." *Richards v. CH2M Hill, Inc.*, 26 Cal. 4th 798, 802 (2001)

6   (emphasis added). The doctrine recognizes that

> [s]ome injuries are the product of a series of small harms, any one of
> which may not be actionable on its own. Those injured in such a
> fashion should not be handicapped by the inability to identify with
> certainty when harm has occurred or has risen to a level sufficient to
> warrant action. Moreover, from a court-efficiency perspective, it is
> unwise to impose a limitations regime that would require parties to
> run to court in response to every slight, without first attempting to
> resolve matters through extrajudicial means, out of fear that delay
> would result in a time-barred action. [Thus,] [a]llegations of a
> pattern of reasonably frequent and similar acts may, in a given case,
> justify treating the acts as an indivisible course of conduct
> actionable in its entirety, notwithstanding that the conduct occurred
> partially outside and partially inside the limitations period.

14  *Aryeh v. Canon Bus. Solns., Inc.*, 55 Cal. 4th 1185, 1198 (2013).

15         In *Richards*, the California Supreme Court laid out the test for a continuing violations

16  theory. *Richards* itself involved a claim for failure to accommodate a disability and disability-

17  based harassment.[8] The California Supreme Court stated:

> [A]n employer's persistent failure to reasonably accommodate a
> disability, or to eliminate a hostile work environment targeting a
> disabled employee, is a continuing violation if the employer's
> unlawful actions are (1) sufficiently similar in kind – recognizing, as
> this case illustrates, that similar kinds of unlawful employer conduct,
> such as acts of harassment or failures to reasonably accommodate
> disability, may take a number of different forms; (2) have occurred
> with reasonable frequency; (3) and have not acquired a degree of
> permanence.

23  *Richards*, 26 Cal. 4th at 823.

24         The third factor – degree of permanence – takes into consideration "when the employee

25  was put on notice that his or her rights had been violated." *Id.* at 814. However, the California

---

[8] But "[n]othing in *Richards* . . . limited application of [the continuing violation] principles to only harassment claims, rather than discrimination or retaliation claims." *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1057 (2005).

United States District Court
Northern District of California

Supreme Court has explained that,

> when an employer engages in a continuing course of unlawful conduct under the FEHA by refusing reasonable accommodation of a disabled employee or engaging in disability harassment, and this course of conduct does not constitute a constructive discharge, the statute of limitations begins to run, *not* necessarily when the employee first believes that his or her rights may have been violated, but rather, *either when the course of conduct is brought to an end*, as by the employer's cessation of such conduct or by the employee's resignation, *or when the employee is on notice that further efforts to end the unlawful conduct will be in vain* [*i.e.*, the employer's statements and actions make clear to a reasonable employee that any further efforts at informal conciliation to obtain reasonable accommodation or end harassment will be futile].

*Id.* at 823 (emphasis added); *see also id.* at 824 (stating that lower appellate court incorrectly "adopted the narrow view that the statute of limitations begins to run as soon as the disabled employee is on notice that his or her rights have been violated[;] [i]t thus did not consider whether [the defendant and plaintiff] continued to be engaged in an informal conciliation process to resolve the latter's grievances concerning the reasonable accommodation of her disability").

The Court holds that, in the case at bar, no reasonable jury could find in Mr. Head's favor on the continuing violations doctrine, and thus Costco is not liable for any alleged retaliation prior to January 2021. The permanence factor, in particular, is an obstacle that Mr. Head cannot overcome. Mr. Head contends that there was no permanence until May 2023, when Costco declined to rehire him, or, alternatively, in June 2022, when he was forced to resign. But no reasonable jury could agree with him on this point. As reflected in his deposition testimony, Mr. Head asserts that Costco continually criticized, nitpicked, and bullied him once he participated in the class action lawsuit filed back in 2001. No reasonable jury could find that Mr. Head did not know Costco's conduct would not change after *years and years* of engaging in such conduct.

In fact, in his deposition, Mr. Head admitted he knew any efforts to stop the criticism would have been in vain. *See, e.g.*, Head Depo. at 76-80 (testifying about criticisms made to him that he had failed to clock in or that he clocked in early before his shift; stating he had "thick skin" about the bullying and nitpicking, "especially since I know that nothing is going to be done about it"); Head Depo. at 169 (testifying that "I know nothing was going to change"). Mr. Head implicitly arrived at this conclusion at least as of December 2017, when he transferred to the

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Modesto store, but continued to be criticized by the manager of that store (Ms. Zizzo) and then,

2    after transferring back to Livermore again, continued to be subject to criticism by other managers.

3            Moreover, as discussed in greater detail below, there is a problem with frequency of the

4    alleged retaliatory acts; over the course of twenty years since his participation in the class action

5    suit, there were numerous gaps between the alleged adverse acts (such as the employee counseling

6    notices) which break the chain of the asserted continuing violation.

7            The Court thus holds that the retaliation claim based on acts prior to January 2021 is time

8    barred.

9            2.    Causation

10            As for the alleged adverse employment actions that are not time barred – *i.e.*, the

11    termination/resignation and the failure to rehire – there is an independent problem.  Specifically,

12    no reasonable jury could find a causal connection between Mr. Head's protected activity and the

13    adverse employment actions.  For example, Mr. Head participated in the wage-and-hour class

14    action from 2001 to 2009.  The termination/resignation and the refusal to rehire took place years

15    later, respectively, in June 30, 2022 and May 2023.  Mr. Head does not explain why, given this

16    significant time gap, it can be inferred that the adverse employment actions were causally related

17    to his participation in the lawsuit.  *See, e.g.*, *Le Mere v. Los Angeles Unified School Dist.*, 35 Cal.

18    App. 5th 237, 243-244 (2019) (noting that "close temporal proximity between a plaintiff's

19    protected activity and the alleged retaliatory conduct . . . has been found sufficient to support a

20    prima facie case of causation"; adding that "[s]everal federal cases hold that intervals of more than

21    a few months were too long to support causation," and, here, there was a gap of two years which

22    "is not sufficient as a matter of law to support an inference of causation").  Although Mr. Head

23    claims that he also advocated for wage-and-hour rights after the lawsuit, he does not provide any

24    specifics about the timing of the advocacy.  Thus, no reasonable jury could infer a connection

25    between that alleged protected activity and the termination/resignation or failure to hire.

26            Implicitly recognizing the above problems with his whistleblower retaliation claim, Mr.

27    Head tried to change course at the hearing on the summary judgment motion.  For the first time,

28    he argued that his whistleblower retaliation claim was based on different protected activity such as

17

1    making a complaint in 2016 about harassment by Mr. Bell and making complaints about being

2    denied disability leave requests in 2021 and/or 2022.  But Mr. Head never identified this activity

3    as protected activity – neither in his complaint or in his opposition to the summary judgment

4    motion.  The argument is therefore waived.

5         Accordingly, the Court grants Costco's motion for summary judgment on the

6    whistleblower retaliation claim (Count 1).

7    C.    Count 8: Wrongful Termination Violation of Public Policy

8         Mr. Head has asserted two claims for wrongful termination in violation of public policy.

9    The claim as pled in Count 8 is based on alleged whistleblower retaliation.  Because the Court is

10   granting summary judgment on the whistleblower retaliation claim, it likewise grants summary

11   judgment on the related claim for wrongful termination in violation of public policy.

12   D.    Counts 2-6: FEHA Claims

13        Counts 2-6 are Mr. Head's FEHA claims.  The main claims are for discrimination and

14   failure to accommodate, both based on his wife's disability.  There are also related claims for

15   failure to prevent discrimination, failure to engage in the interactive process, and retaliation based

16   on a request for accommodation.  Costco argues that part of the claims should be dismissed based

17   on the statute of limitations.  It then makes merits-based arguments challenging each of the claims.

18        1.    Statute of Limitations

19        The FEHA claims have a three-year limitations period.  *See Pollock v. Tri-Modal Dist.*

20   *Servs., Inc.*, 11 Cal. 5th 918, 931 (2021); *see also* Cal. Gov't Code § 12960(e)(5) (providing that

21   "[a] complaint alleging . . . [a] violation of Article 1 (commencing with Section 12940) of Chapter

22   6 shall not be filed after the expiration of three years from the date upon which the unlawful

23   practice or refusal to cooperate occurred").  For purposes of § 12960, "filing a complaint means

24   filing an intake form with the department and the operative date of the verified complaint relates

25   back to the filing of the intake form."  Cal. Gov't Code § 12960(b).  Here, Mr. Head filed his

26   charge on January 1, 2024, and received a right-to-sue letter on the same day.  *See* Alvarez Decl.,

27   Ex. E (complaint filed with the Civil Rights Department and right-to-sue letter).  Thus, according

28   to Costco, only conduct that took place in or after January 2021 falls within the limitations

United States District Court
Northern District of California

18

period.[9]

As noted above, the only adverse employment actions (as alleged) that took place within the limitations period are the termination/resignation and the subsequent refusal to rehire.  Mr. Head again invokes the continuing violations doctrine as means to bring in the adverse employment actions outside of the limitations period – namely, the denials of the transfer requests and the employee counseling notices – as a basis for liability.

a.    Continuing Violations Doctrine

The first set of adverse employment actions that fall outside the limitations period are the denials of the transfer requests.  Costco asserts that the denials of the transfer requests are not sufficiently similar in kind to the adverse employment actions that do fall within the limitations period (*i.e.*, the termination/resignation and refusal to hire).  *See Jumaane v. City of Los Angeles*, 241 Cal. App. 4th 1390, 1402 (2015) (stating that "[t]he continuing violation doctrine requires proof that the conduct occurring outside the limitations period was [*inter alia*] similar or related to the conduct that occurred within the limitations period").  Costco further argues that the permanence factor weighs in its favor.

As above, the Court agrees with Costco that no reasonable jury could find in Mr. Head's favor on the statute of limitations, in particular, because of the permanence factor.  In *Richards*, the California Supreme Court stated that

> the statute of limitations begins to run, not necessarily when the employee first believes that his or her rights may have been violated, but rather, either *when the course of conduct is brought to an end, as by the employer's cessation of such conduct* or by the employee's resignation, or when the employee is on notice that further efforts to end the unlawful conduct will be in vain.

*Richards*, 26 Cal. 4th 798 at 823 (emphasis added).  Here, Mr. Head made requests to transfer in October 2015, January 2016, April 2016, August 2016, and May 2017, all of which were denied.

---

[9] Mr. Head's related claim for wrongful termination in violation of public policy (Count 7) has a shorter limitations period: two years.  *See TrustLabs, Inc. v. Jaiyong An*, o. 21-cv-02606-CRB, 2024 U.S. Dist. LEXIS 58995, at *28-29 (N.D. Cal. Mar. 30, 2024) ("'Under California law, claims of wrongful termination in violation of public policy are governed by the two-year statute of limitations for personal injury claims.'").

United States District Court
Northern District of California

United States District Court
Northern District of California

1   But then, in November 2017, his transfer request was granted (and thus, he began to work at the

2   Modesto store).  At that point, that aspect of Costco's alleged misconduct ended, and, thus, per

3   *Richards*, that started the clock on the statute of limitations with respect to the denial of transfers.

4   *See also id.* at 823-24 (stating that "an employer who is confronted with an employee seeking

5   accommodation of disability or relief from disability harassment may assert control over its legal

6   relationship with the employee either by *accommodating the employee's requests*, or by making

7   clear to the employee in a definitive manner it will not be granting any such requests, thereby

8   commencing the running of the statute of limitations") (emphasis added).

9           The fact that Mr. Head subsequently asked for other accommodations because of his wife's

10  disability has no impact on the Court's analysis.  Even though Mr. Head did ask later for other

11  accommodations, and those accommodations were not given, that does not establish a lack of

12  permanence on the *earlier* denials of his *transfer* requests (*i.e.*, given that a transfer request was

13  ultimately granted).  In this regard, one of the cases that Mr. Head cites – *Willis v. City of*

14  *Carlsbad*, 48 Cal. App. 5th 1104 (2020) – is instructive.  In *Willis*, the plaintiff argued that several

15  denials of transfer and promotion should be counted under the continuing violations doctrine, even

16  though they fell outside the limitations period.  The court held that "[t]here can be no other

17  conclusion . . . that City's independent promotion decisions each became permanent when a

18  different applicant was put in the position."  *Id.* at 1127.  The fact that plaintiff continued to apply

19  for promotions for new openings did "not establish a lack of permanence as to his past

20  applications; we decline to hold his conduct in applying for future jobs revived his claims of

21  retaliation for the City's prior decisions."  *Id.* at 1128.

22          The situation here and in *Willis* is different from that in *Dominguez v. Washington Mutual*

23  *Bank*, 168 Cal. App. 4th 714, 723-24 (2008), where the alleged harasser stopped doing one kind of

24  misconduct (outside the limitations period) and then started to engage in a different kind of

25  misconduct (within the limitations period).  *See id.* at 723-25 (taking note that alleged harasser's

26  offensive comments about sexual orientation "stopped in May 2022" but that thereafter he

27  engaged in other conduct – *e.g.*, "jamming the wheels of [plaintiff's] pallet jack, blocking her

28  access to her workstations with heavy boxes, which she was forced to move, and lying to her

20

1    about whether he had mail ready for her to process, then forcing her to redo her work when it

2    turned out he in fact had mail for her").  The *Dominguez* court held that there was a triable issue of

3    fact on the issue of "permanency," but implicitly that was only because a reasonable jury could

4    find that the harassment never really ceased.  In the case at bar, the failure to accommodate with

5    respect to transfer requests did unequivocally cease when Costco granted the transfer request to

6    Modesto in November 2017.

7                            b.    Employee Counseling Notices

8          The other adverse employment actions (as alleged) that fall outside the limitations period

9    are the employee counseling notices (issued in June 2003, August 2003, June 2006, March 2007,

10   August 2007, July 2010, January 2012, December 2012, September 2015, April 2016, September

11   2016, October 2017, December 2017, June 2018, and June 2020).  *See generally* Brotman Decl.,

12   Ex. B (employee counseling notices).  Costco primarily makes "similarity" and "permanence"

13   arguments: (1) there is insufficient similarity between the counseling notices that fall outside the

14   limitations period and the adverse employment actions that fall within the limitations period (*i.e.*,

15   the termination/resignation and the refusal to rehire) and (2) Mr. Head essentially admitted in his

16   deposition that he knew, well before the limitations period, any efforts to stop the bullying or

17   nitpicking (which would include the counseling notices) would have been in vain.  Costco also

18   briefly argues in its reply brief that the "frequency" factor is a problem for Mr. Head.  *See* Reply at

19   3 n.1.

20         As an initial matter, the Court notes that some of the employee counseling notices were

21   issued *before* Mr. Head's wife was diagnosed with cancer in 2014.  Thus, the only counseling

22   notices that are relevant for the FEHA claims are those dated 2015 and later.

23         Although Costco did not raise its frequency argument until its reply brief, the Court

24   nevertheless considers it because there is overlap between its frequency and similarity arguments.

25   No reasonable jury could find the frequency requirement satisfied.

26         The frequency requirement is directed at evaluating whether a series of acts reflects a

27   *pattern* that justifies treating it as an *indivisible* course of conduct rather than just *isolated*

28   employment decisions.  *See Aryeh*, 55 Cal. 4th at 1198 (stating that "[a]llegations of a pattern of

21

1    reasonably frequent and similar acts may, in a given case, justify treating the acts as an indivisible

2    course of conduct actionable in its entirety"); *Richards*, 26 Cal. 4th at 814 (asking whether "the

3    alleged acts [are] recurring (e.g., a biweekly paycheck) or more in the nature of an isolated work

4    assignment or employment decision?").

5        In *Rabara v. Heartland Empl. Servs., LLC*, No. 17-CV-03770-LHK, 2019 U.S. Dist.

6    LEXIS 71170 (N.D. Cal. Apr. 26, 2019), Judge Koh addressed the issue of frequency in a FEHA

7    case.  The plaintiff was a nurse who worked at the defendant health care facility from March 2009

8    until December 2014, when she was terminated.  The defendant terminated her employment after

9    she had taken three leaves of absences (which included extensions): (1) from June 2010 to

10   December 2010; (2) from September 2013 to March 2014; and (3) from April 2014 to December

11   2014.  The plaintiff then made a fourth request for leave, to last through April 2015.  The

12   defendant's decision-making

13           group reviewed Plaintiff's medical leave history and "determined
             that, based on the review of her record as a whole, including the
14           multiple requests for leaves of absences and upwards of 20 requests
             for extensions of those leaves, we could no longer treat any single
15           request for an excused absence for [Plaintiff] as a request for
             definite leave."  Marangi Decl. ¶ 12.  "Because of extension after
16           extension, [Plaintiff's] leave appeared indefinite, and we did not feel
             with any measure of reasonable certainty that [Plaintiff] would
17           actually return on or even near the date indicated on her doctor's
             note, if at all."  *Id.*  As a result, the group "recommended that
18           [Plaintiff's] employment be terminated."  *Id.*; *see also* Marangi Dep.
             at 40:22-44:22.  The decision to terminate was based on "a
19           consideration that there didn't seem to be an end in sight because of
             the repeated extensions. And [Plaintiff] had already been
20           accommodated with 58 weeks of leave."

21   *Id.* at *15-16.  The plaintiff was subsequently terminated in December 2014.

22        The plaintiff filed suit against the defendant, asserting a number of FEHA claims related to

23   her disability.  The defendant argued that any claims based on conduct before March 2014 were

24   time barred.  In response, the plaintiff invoked the continuing violations doctrine.  On summary

25   judgment, Judge Koh agreed with the defendant that there was a time bar, holding that there was

26   no genuine dispute of fact on either the similarity or frequency requirements of the continuing

27   violations doctrine.

28        On the issue of frequency, Judge Koh noted as follows:

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

> Plaintiff alleges that her wrongdoers engaged in discriminatory
> conduct related to her eye in six instances between 2009 to 2012:
> summer of 2009, June 2010, June 2011, October 2011, "late" 2011,
> and throughout 2012. *See* Amend. Compl. ¶¶ 19, 37, 52, 53-54, 57,
> 60; Mot. at 15. Even if the Court excuses the period when Plaintiff
> took a leave of absence from June 7, 2010 to December 2, 2010,
> Plaintiff has still failed to show that this conduct was otherwise
> "continuous." *See, e.g.*, *Murdock v. Cty. of Fresno*, No. CV F 09-
> 0547 LJO SMS, 2010 U.S. Dist. LEXIS 122373, (E.D. Cal. Nov. 18,
> 2010) (finding no frequency and calling plaintiff's discrimination
> claims "sporadic" and "infrequent" when the discriminatory acts
> prior to the statute of limitations date included three acts in 2002,
> one act in 2004, two acts in 2005, and one act in 2006).

*Id.* at *40-41; *see also Hoppe v. City of San Diego*, No. D071668, 2018 Cal. App. Unpub. LEXIS

1882, at *18 (Cal. Ct. App. Mar. 22, 2018) ("Hoppe identifies only four instances of

discrimination over a six-year period, which can best be described as sporadic rather than frequent

in that time span."). Judge Koh also factored into her frequency analysis that the alleged

wrongdoing was accomplished by "seventeen different individuals who engaged in varied and

unrelated conduct with no common motivation or purpose over a period of five years." *Rabara*,

2019 U.S. Dist. LEXIS 71170, at *41.

  Finally, Judge Koh took into account the decisions of several courts holding that

> misconduct is not frequent when there are six month gaps or longer
> in the misconduct. *See, e.g.*, *Brennan v. Townsend & O'Leary
> Enterprises, Inc.*, 199 Cal. App. 4th 1336 at 1354 n.4 (Cal. Ct. App.
> 2011) ("[W]e cannot see how the incidents of wrongful conduct
> relied upon by plaintiff in this action can be considered as
> continuing with reasonable frequency when the incidents are spaced
> apart no less than six months and sometimes more than a year.");
> *Adetuyi v. City & Cty. of San Francisco*, No. A124936, 2011 Cal.
> App. Unpub. LEXIS 3662, 2011 WL 1878853, at *7 (Cal. Ct. App.
> May 17, 2011) ("We agree with the trial court that wrongful conduct
> cannot be considered 'continuing' or 'reasonably frequent' when no
> memorable incident occurred for the space of an entire year. If the
> level of sexual or retaliatory harassment falls to a level so minimal
> that it results in no memorable events for an entire year, it has
> effectively ceased."). Here, there are multiple gaps between the
> alleged wrongdoers' conduct, and some of the gaps are at least six
> months.

*Id.* at *42-43; *see also Saindon v. Fed. Express Corp.*, No. C-02-01080 WHA, 2003 U.S. Dist.

LEXIS 5861, at *10-11 (N.D. Cal. Apr. 7, 2003) (stating that the alleged sexual harassment

involved "Verticelli's complimentary comments and Frakes' single slap on the buttocks that

occurred in 1997 and 1998," as well as "comments by Cunyo and Fryor that occurred in May

2000"; these actions "did not occur with enough frequency to be considered a course of conduct or a consistent pattern").

The instant case bears important similarities to *Rabara*. In *Rabara*, there were six alleged acts of misconduct in a four-year period. Here, there are seven employee counseling notices (dated September 2015, April 2016, September 2016, October 2017, December 2017, June 2018, and June 2020) issued over a five-year period. Also, there is a two-year gap between the last counseling notice (issued in June 2020) and Mr. Head's termination/resignation (in June 2022) – although that timing is admittedly informed, at least in part, by the fact that Mr. Head was on continuous leave starting in March 2021. The employee counseling notices are isolated incidents, as underscored by the fact that they were issued by six different managers. (In other words, only one manager issued more than one counseling notice.) The "witnesses" to the alleged violations of policy were also all different. The gaps are too numerous too long, and too discontinuous to provide a basis for the continuing violation doctrine.

The Court acknowledges that some of the employee counseling notices issued to Mr. Head cover similar conduct. Specifically, a number of the counseling notices relate to work time: tardiness, clocking in and out, etc. Nevertheless, the fact that multiple *different* managers called out the same problem underscores that there was not a *pattern* of misconduct on the part of Costco, at least absent some evidence suggesting there was some kind of concerted agreement among the managers or direction from management to "get" Mr. Head. There is no such evidence.

Moreover, even if there might be a question of fact on the frequency requirement, Mr. Head fails to adequately address Costco's argument that no reasonable jury could find in his favor on the permanence factor. As discussed above, Mr. Head fails to address his deposition testimony in which he essentially stated that he knew nothing was going to change and that the bullying and nitpicking (which included the employee counseling notices) would continue.

c. Summary

Accordingly, the Court concludes that no reasonable jury could find in Mr. Head's favor on the statute of limitations. Both the transfer denials and the employee counseling notices are outside the limitations period and Mr. Head has failed to show that a reasonable jury could find in

his favor on the continuing violations doctrine.

2.    Counts 2 and 3: Disability Discrimination and Failure to Prevent/Remedy
Discrimination

Because the transfer denials and employee counseling notices are time barred, this leaves as the only alleged adverse employment actions (1) the termination/resignation and (2) the failure to rehire.  Mr. Head contends that these actions were made on a discriminatory basis, specifically, animus based on disability – the disability being his association with his wife, a disabled person.  *See, e.g.*, Cal. Gov't Code § 12940(a) (providing that "[i]t is an unlawful employment practice . . . [f]or an employer, because of the race, religious creed, color, national origin, ancestry, *physical disability*, mental disability, [etc.] to refuse to hire or employe the person") (emphasis added); *id.* § 12926(o)(3) (providing that "'[r]ace, religious creed, color, national origin, ancestry, *physical disability*, mental disability, [etc.] *includes* . . . [a] perception that the person is *associated* with a person who has, or is perceived to have, any of those characteristics or any combination of those characteristics," which include physical disability) (emphasis added).  In other words, he asserts discrimination based on associational disability here.  He further asserts that Costco failed to prevent or remedy such discrimination.

a.    Legal Background

As reflected by the language of the statutes cited above, there is no dispute that "FEHA provides a cause of action for associational disability discrimination, although it is a seldom-litigated cause of action."  *Castro-Ramirez v. Dependable Highway Express, Inc.*, 2 Cal. App. 5th 1028, 1036 (2016).

> A prima facie case of disability discrimination under FEHA requires a showing that (1) the plaintiff suffered from a disability, (2) the plaintiff was otherwise qualified to do his or her job, with or without reasonable accommodation, and (3) the plaintiff was subjected to adverse employment action because of the disability.  Adapting this framework to the associational discrimination context, the "disability" from which the plaintiff suffers is his or her association with a disabled person.  Respecting the third element, the disability must be a substantial factor motivating the employer's adverse employment action.
>
> Once the plaintiff establishes a prima facie case, "the burden then shifts to the employer to offer a legitimate, nondiscriminatory reason

United States District Court
Northern District of California

> for the adverse employment action." The plaintiff may then show the employer's proffered reason is pretextual or offer any further evidence of discriminatory motive. "In an appropriate case, evidence of dishonest reasons, considered together with the elements of the prima facie case, may permit a finding of prohibited bias."

*Id.* at 1037.

Notably, in *Castro-Ramirez*, the court emphasized that a claim for associational disability discrimination is *independent* from a claim for failure to accommodate. *See id.* at 1038 (declining "to decide whether FEHA establishes a separate duty to reasonably accommodate employees who associate with a disabled person" but noting that, "[e]ven if [the defendant] had no separate duty under FEHA to provide plaintiff with reasonable accommodations for his son's illness, [the question was whether] there was sufficient evidence that discriminatory animus motivated [the supervisor's] refusal to honor plaintiff's scheduling request and his termination of plaintiff"). However, it further emphasized that accommodation may still provide the basis of a claim for disability discrimination.

> We first observe that no published California case has determined whether employers have a duty under FEHA to provide reasonable accommodations to an applicant or employee who is associated with a disabled person. We acknowledge that the reasonable accommodation subdivision of section 12940 does not expressly refer to persons other than an applicant or employee. The pertinent language makes it an unlawful employment practice "[f]or an employer or other entity covered by this part to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee." (§ 12940, subd. (m)(1).) But we do not read subdivision (m)(1) in isolation; instead we read parts of a statutory scheme together and construe them in a manner that gives effect to each. (*City of Huntington Beach v. Board of Administration* (1992) 4 Cal.4th 462, 468.) And under section 12926, subdivision (o), "'physical disability …' includes a perception" that a person "is associated with a person who has, or is perceived to have," a physical disability. In other words, association with a physically disabled person appears to be itself a disability under FEHA. Like the many other definitions set forth in section 12926, this definition of a physical disability applies "in connection with unlawful practices [under FEHA], unless a different meaning clearly appears from the context." (§ 12926.) Accordingly, when section 12940, subdivision (m) requires employers to reasonably accommodate "the known physical … disability of an applicant or employee," read in conjunction with other relevant provisions, subdivision (m) may reasonably be interpreted to require accommodation based on the employee's association with a physically disabled person. Again, given plaintiff's concession [not to proceed with a failure-to-accommodate claim], we do not decide

1

2

> this point.  We only observe that the accommodation issue is not settled and that it appears significantly intertwined with the statutory prohibition against disability discrimination, a subject to which we now turn.

3

4

5

6

7

8

> As we explained above, FEHA creates an associational disability discrimination claim in the manner just described – by reading association with a physically disabled person (§ 12926, subd. (o)) into the Act where discrimination based on "physical disability" appears (§ 12940, subd. (a)).  By express terms, the two pertinent sections of FEHA make it unlawful to "discharge [a] person from employment" (§ 12940, subd. (a)) based on physical disability and other characteristics, which include "a perception that the person has any of those characteristics or that the person is associated with a person who has, or is perceived to have, any of those characteristics." (§ 12926, subd. (o).)

9    *Id.* at 1038-39.[10]

10                      b.      Termination/Resignation

11           In the case at bar, the first adverse employment action at issue is Mr. Head's

12   termination/resignation.  The Court concludes that no reasonable jury could find that a

13   "discriminatory animus motivated" the termination/resignation.  *Castro-Ramirez*, 2 Cal. App. 5th

14   at 1038; *see also id.* at 1037 ("Respecting the third element, the disability must be a substantial

15   factor motivating the employer's adverse employment action").  The evidence reflects that, when

16   Costco asked Mr. Head to come back to work by July 2022, it was because he had been on

17   continuous leave since March 15, 2021 – several months past Costco's on-year leave policy.  To

18   be sure, part of Mr. Head's absence during this time was due to his wife's disability – *i.e.*, Costco

19   had provided Mr. Head leave under the FMLA/CFRA so that he could take care of his wife.  But

20   that fact, if anything suggests that there was no discriminatory animus on the part of Costco

21   because it gave Mr. Head leave so that he could care for his wife.  Contrary to what Mr. Head

22   seems to suggest, such discriminatory intent cannot be inferred simply because leave beyond that

23   provided for under the FMLA/CFRA (and beyond the total leave time provided for under Costco's

24

25   —————————————

26   [10] The *Castro-Ramirez* court took note that FEHA's approach to associational disability discrimination was different from the ADA's, precisely because of how FEHA chose to define disability.  "Unlike FEHA, the ADA does not define the term 'disability' itself as including association with the disabled.  Instead, it defines *discrimination* based on association as one type of "'discriminat[ion] against a qualified individual on the basis of disability."'"  *Castro-Ramirez*, 2 Cal. App. 5th at 1040 (emphasis in original).  Because of such differences, "federal precedent is less helpful than in other FEHA interpretations."  *Id.*

27

28

leave policy) is not given.

The situation here is far different from that in *Castro-Ramirez*, where the court held that there was sufficient evidence from which a discriminatory intent could be inferred.  The plaintiff in *Castro-Ramirez* was a delivery driver.  Historically, he had been given a schedule that permitted him to leave early enough so that he could make it home to give his son dialysis.  However, a new supervisor – "Junior" – was appointed, and that supervisor began putting the plaintiff on a later schedule, interfering with the plaintiff's ability to get home to tend to his son.  This prompted the plaintiff's former supervisor

> to remind Junior of plaintiff's need to be home for his son's dialysis. Despite knowing plaintiff's need to be home early, the month after Junior took over, he scheduled plaintiff for a shift that started at noon, later than plaintiff had ever started before.  Junior did this even though eight other shifts well before noon were available, and even though DHE's customer had specifically requested that plaintiff – the customer's regular driver – do its 7:00 a.m. deliveries.  There was no apparent reason why Junior could not have scheduled plaintiff for one of these earlier shifts.  (The explanation Junior proffered earlier for not assigning plaintiff the 7:00 a.m. shift was false. Junior told plaintiff the customer was unhappy with his work and did not want him making the customer's deliveries; in fact, the customer's feedback was quite the opposite, and plaintiff never had any performance issues at DHE.)  Plaintiff told Junior he could not work the shift and route assigned to him because he had to be home to administer dialysis to his son, but he asked to return the next day for an assignment.  It should have been apparent plaintiff was not acting in bad faith or simply being insubordinate.  Yet Junior ignored plaintiff's requests.  Instead, he laughed and told plaintiff Bermudez was not in charge anymore.  Even though [the defendant company] DHE's policies allowed for less severe disciplinary action than termination, for plaintiff's one-time refusal to work the shift assigned to him, Junior terminated him.
>
> One reasonable inference from these facts is that Junior, as the person responsible for scheduling the drivers, wanted to avoid the inconvenience and distraction plaintiff's need to care for his disabled son posed to Junior.  Thus, Junior engineered a situation in which plaintiff would refuse to work the shift, giving Junior reason to terminate him.  In other words, plaintiff's termination for refusal to work the shift was a pretext for Junior's desire to be rid of someone whose disabled associate made Junior's job harder.  Just as the facts in *Rope* gave rise to the inference that the employer acted preemptively to avoid the expense of paid leave, these facts may give rise to the inference that Junior acted proactively to avoid the nuisance plaintiff's association with his disabled son would cause Junior in the future.

*Castro-Ramirez*, 2 Cal. App. 5th at 1042-43.  It was evident that the defendant there engaged in

purposeful imposition of burdens because of plaintiff's son's disability. No such purposeful attempt to harm Mr. Head in the instant case may be inferred.

Accordingly, the Court grants Costco summary judgment both on the intentional discrimination claim and the derivative claim for failure to prevent discrimination. Of course, even in the absence of discriminatory intent, Mr. Head could still have a claim for failure to accommodate, which is discussed *infra*.

c.    Failure to Rehire

Costco is also entitled to summary judgment on the discrimination claims based on the failure to rehire. Here, the immediate decisionmaker was Mr. Maldanado. He testified that, at the time he made the decision not to rehire Mr. Head, he knew that Mr. Head's wife had died but he did not know the circumstances underlying Mr. Head's prior resignation. This testimony is consistent with the fact that Mr. Maldanado was new to the Livermore store and had never worked with Mr. Head previously. Although Mr. Maldanado's superior, Mr. Sakuma, had worked with Mr. Head previously, there is no evidence suggesting that he influenced Mr. Maldanado's decision – *i.e.*, all Mr. Sakuma did was approve the decision that Mr. Maldanado made, free from any knowledge of the circumstances related to the prior resignation. Given the evidence of record, no reasonable jury could find in Mr. Head's favor that the failure to rehire was based on animus related to Mr. Head's wife's disability.

At the hearing, Mr. Head pointed out that Mr. Maldanado made the decision not to rehire based on the employee counseling notices (*i.e.*, the fact that they were not signed). Mr. Head seems to suggest here that the employee counseling notices *were* issued on a discriminatory basis, such that the animus of the managers who issued the notices should be imputed to Mr. Maldanado – in effect, a cat's paw theory. There are several problems with Mr. Head's position. First, Mr. Head has not pointed to evidence from which it could be inferred that each of the managers who issued the counseling notices had a discriminatory animus based on Mr. Head's wife's disability. Second, it is not clear from the record which employee counseling notices Mr. Maldanado viewed; as noted above, a number of the notices were issued before Mr. Head's wife was diagnosed with cancer. Even if the Court has an obligation to make all reasonable inferences in Mr. Head's favor,

United States District Court
Northern District of California

1    there must still be a basis for the Court to infer that Mr. Maldanado saw notices from the relevant

2    time period (*i.e.*, after Mr. Head's wife was diagnosed in 2014).  Third, even if Mr. Maldanado did

3    see the notices from the relevant time period, that still does not mean any alleged animus from the

4    employee counseling notices is imputable to Mr. Maldanado.  No evidence suggests a basis for

5    imputing any such animus that might be behind the earlier counseling notices to Mr. Maldanado,

6    especially since there is no evidence that Mr. Maldanado was aware of any such animus

7    motivating the letters.  Moreover, there is no evidence that Mr. Maldanado decided not to rehire

8    Mr. Head because employee counseling notices had been *issued* to Mr. Head.  Rather, Mr.

9    Maldanado's concern was that Mr. Head had *refused to sign* the notices which indicated to him

10   that Mr. Head was a "problem" employee.  No animus can be imputed to Mr. Maldanado.

         d.    Summary

12   For the foregoing reasons, the Court grants Costco summary judgment on Mr. Head's

13   discrimination claims, whether based on the termination/resignation or the failure to hire.

14       3.    Counts 4-6: Failure to Accommodate, Failure to Engage in the Good Faith

15             Interactive Process, and Retaliation Based on Accommodation Requests

16       In addition to the associational disability discrimination claims above, Mr. Head has

17   asserted claims for failure to accommodate, failure to engage in the good faith interactive process,

18   and retaliation based on accommodation requests.  A failure to accommodate is one kind of

19   disability discrimination but involves different legal elements.  *See, e.g.*, *Jensen v. Wells Fargo

20   Bank*, 85 Cal. App. 4th 245, 256-57 (noting that an accommodation claim and a discrimination

21   claim are similar but "there are important differences" – *e.g.*, an adverse employment action is not

22   required for an accommodation claim); *see also Scotch v. Art Inst. of Cal.*, 173 Cal. App. 4th 986,

23   1009-1010 (2009) (stating that "[t]he elements of a failure to accommodate claim are (1) the

24   plaintiff has a disability under the FEHA, (2) the plaintiff is qualified to perform the essential

25   functions of the position, and (3) the employer failed to reasonably accommodate the plaintiff's

26   disability").

27       Costco's main attack on the accommodation claims is that, as a matter of law, they are not

28   viable because accommodation claims cannot be based on associational disability (even though

discrimination claims can be).  There is a split among courts as to whether accommodation claims can be based on associational disability.

As noted above, the court in *Castro-Ramirez* formally declined to address whether an accommodation claim is viable when based on a person's association with a disabled person but strongly indicated that it would be:

> [U]nder section 12926, subdivision (o), "'physical disability …' includes a perception" that a person "is associated with a person who has, or is perceived to have," a physical disability.  In other words, association with a physically disabled person appears to be itself a disability under FEHA.  Like the many other definitions set forth in section 12926, this definition of a physical disability applies "in connection with unlawful practices [under FEHA], unless a different meaning clearly appears from the context."  (§ 12926.)  Accordingly, when section 12940, subdivision (m) requires employers to reasonably accommodate "the known physical … disability of an applicant or employee," read in conjunction with other relevant provisions, subdivision (m) may reasonably be interpreted to require accommodation based on the employee's association with a physically disabled person.

*Castro-Ramirez*, 2 Cal. App. 5th at 1038-39.

Based on *Castro-Ramirez*, several district courts have held that an accommodation claim can be based on a failure to accommodate an associated person's disability (*i.e.*, even if the plaintiff himself is not disabled).  For example, in *Acosta v. NAS Ins. Servs., LLC*, No. 2:25-cv-00656-MCS-PVC, 2025 U.S. Dist. LEXIS 62362 (C.D. Cal. Mar. 31, 2025), the district court provided the following analysis:

> As a preliminary matter, both parties agree the California Supreme Court has not decided whether associational disability extends to subsections (m) and (n) [*i.e.*, failure to accommodate and failure to engage in good faith interactive process].  However, in this case the Court "must predict how [the California Supreme Court] would decide the issue."  *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1284 (9th Cir. 2017).  Although neither party cites it, another court in this district has issued a published opinion on the same question in front of this Court and concluded "the FEHA permits employees to bring accommodation and interactive-process claims based on a theory of associational disability."  *See McVay v. DXP Enters., Inc.*, 645 F. Supp 3d 971, 975 (C.D. Cal. 2022).  Setting aside this persuasive decision, this Court independently arrives at the same conclusion.
>
> The Court first examines the text of the statute.  *White v. County of Sacramento*, 31 Cal. 3d 676, 681 (1982) ("[A] court is to construe a

United States District Court
Northern District of California

statute so as to effectuate the purpose of the law." (internal quotation marks omitted)).  FEHA prohibits employment discrimination based on "[r]ace, religious creed, color, national origin, ancestry, physical disability, mental disability, reproductive health decisionmaking, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or veteran or military status."  Cal Gov't Code § 12940(a).  Associational disability is not expressly mentioned in this list, but in the "Definitions" section, FEHA provides that "unless a different meaning clearly appears from the context," *id.* § 12926, this list of protected characteristics is defined to include "[a] perception that [a] person is associated with a person who has, or is perceived to have, any of those characteristics or any combination of those characteristics," *id.* § 12926(o)(3).  Therefore, the definition of "disability" under FEHA includes those who are associated with someone who possesses a disability.  Consistent with this, a California Court of Appeal has determined that "FEHA provides a cause of action for associational disability discrimination."  *Castro-Ramirez v. Dependable Highway Express, Inc.*, 2 Cal. App. 5th 1028, 1036 (2016).  The appellate court articulated that the definition of disability in FEHA "embraces association with a physically disabled person."  *Id.*

On this basis alone, the Court believes that when "disability" is referenced in FEHA, the term is meant to include associational disabilities.  Therefore, when section 12940(m) provides that employers must make reasonable accommodation "for the known physical or mental disability of an applicant or employee," and when section 12940(n) states employers must engage in a good faith interactive process in response to a request for accommodation "by an employee or applicant with a known physical or mental disability," the statutes embrace employees perceived to be associated with a person who is disabled, as Plaintiff is in this case.

NAS argues that sections 12940(m) and (n) do not expressly state that they apply to individuals with associational disabilities.  (MTD 5-6.)  However, NAS does not provide this Court with any compelling argument why it should not read the definition of disability from section 12926(o) into section 12940.  Indeed, as the appellate court in *Castro-Ramirez* opined, section 12940(m) should not be read "in isolation," but rather as part of the broader statutory scheme, which suggests that section 12940(m) "may reasonably be interpreted to require accommodation based on the employee's association with a physically disabled person."  *Castro-Ramirez*, 2 Cal. App. 5th at 1038-39.  In line with this Court's interpretation, the court in *McVay* also took this guidance to mean that "disability" is defined throughout the statutory scheme to include associational disability as well.  *McVay*, 645 F. Supp. 3d at 976; *see also Castro v. Classy, Inc.*, No. 3:19-cv-02246-H-BGS, 2020 U.S. Dist. LEXIS 35556, at *12-14 (S.D. Cal. Mar. 2, 2020) (finding that a plaintiff's associational disability claims brought under subsections (m) and (n) were sufficient to survive a motion to dismiss).

*Id.* at *8-11; *see also McVay v. DXP Enters., Inc.*, 645 F. Supp. 3d 971, 975 (C.D. Cal. 2022)

(concluding that "*Castro-Ramirez* is among the best indicia of the viability of accommodation and

United States District Court
Northern District of California

1    interactive-process claims based on associational disability"; moreover, "[o]n the merits, *Castro-*

2    *Ramirez* correctly interpreted the FEHA").

3        Notwithstanding such authorities, Costco points out that, in some unpublished (and non-

4    binding) cases, state appellate courts have held that an accommodation claim cannot be based on

5    an associated person's disability.  *See, e.g.*, *Shahin v. Kaiser Found. Health Plan*, No. B307750,

6    2023 Cal. App. Unpub. LEXIS 2513 (Cal. Ct. App. May 1, 2023); *Monterroso v. Hydraulics Int'l*

7    *Inc.*, No. B299946, 2022 Cal. App. Unpub. LEXIS 54 (Cal. Ct. App. Jan. 4, 2022).

8        In *Shahin*, the state court acknowledged the comments made by the court in *Castro-*

9    *Ramirez*, but disagreed with its assessment that it was reasonable to conclude that an

10   accommodation claim could be based on an associated person's disability.

> 11   Under Government Code section 12926, subdivision (o), association
> 12   with a disabled person is a protected characteristic. (Gov. Code, §
>      12926, subd. (o) [defining protected characteristics including
> 13   "'physical disability, mental disability, [and] medical condition" to
>      include "a perception that . . . the person is associated with a person
> 14   who has, or is perceived to have, any of those characteristics"].)
>      Thus, section 12926, subdivision (o) incorporates associational
> 15   disability into instances where FEHA *includes the list of protected
>      characteristics*; for example, it is incorporated into the code sections
> 16   governing disability discrimination.  (See Gov. Code, § 12940,
>      subds. (a)-(d) & (j)(1).)
>
> 17   In contrast to FEHA's provisions regarding discrimination, the
>      provisions regarding an employer's duty to accommodate a disabled
> 18   employee neither mention association with a disabled person *nor
>      incorporate the list of protected characteristics* that includes
> 19   association with a disabled person.  Government Code section
>      12940, subdivision (m)(1), requires employers "to make reasonable
> 20   accommodation for the known physical or mental disability of an
>      applicant or employee."  Government Code section 12940,
> 21   subdivision (n) further requires an employer "to engage in a timely,
>      good faith, interactive process with [an] employee . . . to determine
> 22   effective reasonable accommodations, if any, in response to a
>      request for reasonable accommodation by an employee . . . with a
> 23   known physical or mental disability or known medical condition."
>      FEHA's definitions of "[p]hysical disability," "[m]edical condition,"
> 24   and "[m]ental disability" do not include association with another
>      who has a disability.  (Gov. Code, § 12940, subds. (j) & (m).)  Thus,
> 25   based on the plain language of these sections, FEHA does not
>      require an employer to accommodate an employee's association with
> 26   a person who has a disability.  (*See Segal v. ASICS America Corp.*
>      (2022) 12 Cal. 5th 651, 662 [courts follow the plain meaning of
> 27   clear statutory language unless absurd consequences would result].)

28   Our interpretation of the FEHA provisions governing reasonable

United States District Court
Northern District of California

accommodation claims is consistent with the legislative history of Government Code section 12926, subdivision (o). The Legislature expanded the list of protected characteristics to include associational disability in a bill seeking to expand the scope of FEHA's protections against discrimination *specifically*. An analysis by the Assembly Judiciary Committee staff describes the bill as "clarif[ying] that FEHA's protections against housing and employment discrimination cover associational rights as well, i.e., discrimination based upon perceptions about who one may be associating with will now be protected under the Act." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1670 (1999-2000 Reg. Sess.) May 11, 1999, p. 15.) The key issue raised by the bill was whether "civil rights statutes [should] be amended to strengthen discrimination protections or clarify ambiguities in the law[.]" (*Id.* at p. 1., original formatting omitted.) This analysis demonstrates the Legislature added section 12926, subdivision (o) to FEHA to strengthen *discrimination* protections, not to expand the scope of interactive process or reasonable accommodation claims.

Accordingly, consistent with the plain language of FEHA and the legislative history, we conclude FEHA does not impose reasonable accommodation or interactive process obligations on an employer based on an employee's association with a family member or other person who has a disability.

*Id.* at *35-37 (emphasis added).

In *Monterroso*, the state court also used the same basic reasoning:

The FEHA contains two companion requirements related to an employer's duty to provide reasonable accommodation for a disabled employee. Section 12940, subdivision (m), first obligates employers "to make reasonable accommodations for the known physical or mental disability of an applicant or employee." To assure that the burden is not placed on the employee to alone identify what reasonable accommodations might be required, section 12940, subdivision (n), further requires an employer "to engage in a timely, good faith, interactive process with [an] employee . . . to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee . . . with a known physical or mental disability or known medical condition." Neither section expands the concepts of physical disability, mental disability, or known medical condition to include associational disability. Nor do the general FEHA definitions of "[p]hysical disability," known "medical condition" or "[m]ental disability" contain any mention of associational disability. (§12926, subds. (i), (j) & (m).)

Monterroso argues that we should nevertheless read associational disability into the definition of "physical disability" employed in the interactive process section. To support this argument, he relies on section 12926, subdivision (o), with which the Legislature expressly incorporated the concept of associational disability into *other* FEHA language – language that does not appear in the sections governing either interactive process or reasonable accommodation claims, but instead appears in sections addressing FEHA discrimination and

harassment claims.

> Monterroso is correct that section 12926, subdivision (o) includes associational disability in its list of so-called protected characteristics, based on which the FEHA prohibits an employer from, for example, discriminating or harassing an employee: "'[r]ace, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, age, sexual orientation, or veteran or military status.'" (§ 12926, subd. (o).) Specifically, section 12926, subdivision (o) clarifies that this list "includes a perception that the person has any of those characteristics or that the person is associated with a person who has, or is perceived to have, any of those characteristics." (*Ibid.*) Thus, section 12926, subdivision (o) incorporates associational disability into only instances where the FEHA *employs its list of protected characteristics*; for example, into the code sections governing disability discrimination. (*See* § 12940, subds. (a)-(d) & (j)(1).)

*Monterroso*, 2022 Cal. App. Unpub. LEXIS 54, at *24-26 (italics in original; bold added).

The Court finds *Castro-Ramirez* and its progeny more persuasive than *Shahin* and *Monterroso*, particularly because the latter cases do not take into account the following.

- Section 12926, which is the "definitions" section for unlawful practices under FEHA, makes clear that the definitions provided in the section apply to the *entirety* of Part 2.8, which thereby includes § 12940 and *all* of its subdivisions, whether, *e.g.*, § 12940(a) (discrimination) or § 12940(m) (accommodation). *See* Cal. Gov't Code § 12926 (providing for definitions "[a]s used in *this part* in connection with unlawful practices, unless a different meaning clearly appears from the context") (emphasis added).

- Section 12926 further states that the definitions apply "unless a different meaning *clearly* appears from the context." Cal. Gov't Code § 12926 (emphasis added).

- Although "physical disability" and "mental disability" as defined in §§ 12926(m) and (j) do not mention associational disability, that does not bar inclusion of associational disability, particularly because §§ 12926(m) and (j) state that "physical disability" and "mental disability" "include[], *but is not limited to*, all of the following." *Id.* §§ 12926(m), (j) (emphasis added).

- FEHA expressly provide that (1) it is "the public policy of [California] that it is necessary to protect and safeguard the right and opportunity of all persons to seek

obtain, and hold employment without discrimination or abridgment on account of race, religious creed, color national origin, ancestry, physical disability, mental disability, [etc.]"; (2) "[i]t is the purpose of this part to provide effective remedies that will eliminate these discriminatory practices," *id.* § 12920; and (3) "[t]he provisions of this part shall be construed liberally for the accomplishment of the purposes of this part." *Id.* § 12993(a).

The Court therefore rejects Costco's contention that Mr. Head's accommodations claims, because based on associational disability, are not viable.

The Court also concludes that Mr. Head's accommodation claims survive the summary judgment challenge because a reasonable jury could find in Mr. Head's favor. A reasonable jury could conclude that Mr. Head sought only an accommodation through the end of the 2022 (definite, not indefinite leave) and that such an accommodation was reasonable (even if Mr. Head had exhausted his leave under Costco's policy and the FMLA/CFRA). Moreover, the facts as noted below make clear that the request for additional leave was based on Mr. Head's wife's disability, not his.

To the extent Costco suggests that, at the very least, the claim for failure to engage in the good faith interactive process should be subject to summary judgment, that claim still involves genuine disputes of material fact that cannot be adjudicated at summary judgment. *See, e.g.*, *Tanaka v. UPS*, No. 22-cv-05476-TLT, 2024 U.S. Dist. LEXIS 221844, at *24 (N.D. Cal. Sept. 16, 2024) (stating that "'[t]he interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees'" and "[c]ourts have found there to be a disputed issue of material fact where an employer makes a unilateral decision regarding an employee's accommodations"). The record indicates that, on April 3, 2022, Mr. Head told Costco that he was able to work ("There is no issue of my ability to do my job!") but that he needed to remain off work ("FMLA or not") to care for his wife who had cancer. Head Depo., Ex. 23 (letter) (available at Docket No. 27-1 (ECF Page 156)). A few days later, Mr. Head submitted a medical note stating that, physically, he was able work to work but that his chronically ill wife depended on him for 24-hour care so that he was not able to return to

1    work in 2022.  *See* Head Depo., Ex. 24 (doctor's note) (available at Docket No. 27-1) (ECF Page

2    157)).  The note also stated: "We will reassess work status in 1/1/2023."  Head Depo., Ex. 24.

3          Mr. Head did not return to work on May 8, 2022.  Thereafter, in June 2022, Costco sent

4    Mr. Head a letter, advising him that he had exhausted the leave available to him under company

5    policy and that he was not eligible for additional FMLA/CFRA leave in order to care for his wife.

6    Because Mr. Head's doctor indicated that Mr. Head was able to work, Costco scheduled him for

7    work starting July 5, 2022.  *See* Head Depo., Ex. 27 (letter) (available at Docket No. 27-1 (ECF

8    Page 158)).

9          Notably, in the letter, Costco appeared to differentiate between an accommodation based

10   on the health of Mr. Head's wife and Mr. Head's own health:

11              If you disagree and believe that you are not able to work *due to your*
                *own serious health condition* without restrictions, or have any
12              questions or concerns, please contact me as soon as possible and **by**
                **July 7, 2022**.  If at any time you need assistance, please let me know
13              so that we may discuss how we may be able to assist you.   Given
                the circumstances, if you are not able to return to work due to your
14              need to care for your spouse, and as mentioned earlier you are not
                eligible to take leave for this reason, we are giving you the
15              opportunity to voluntarily resign your employment.  If you would
                like to consider voluntarily resigning your employment, enclosed is
16              a resignation/termination form for you to complete and sign to
                reflect your resignation.  Please return the completed and signed
17              form **by July 7, 2022**.

18              You are expected to follow the call in procedures.  If you fail to
                return to work as scheduled, your leave will be unauthorized and
19              subject to discipline up to and including termination of employment,
                in accordance with Company Policy.  If you return to work, until
20              you have FMLA leave available, any future absences to care for
                your family member will be treated in accordance with Company
21              policy and may be subject to discipline unless you are using
                available sick/personal time.
22

23   *Id.* (italics added; bold in original).  The above suggests that Costco was willing to engage in the

24   interactive process if Mr. Head was asking for leave because of his own condition but *not* if he

25   was asking for leave because of his wife's.  If so, that might substantiate Mr. Head's position that

26   Costco failed to engage in the interactive process in good faith.  To be sure, the Court

27   acknowledges that, overall, Costco extended family leave to Mr. Head (and for his wife) for

28   periods of time that exceeded the FMLA/CFRA and Costco's policy, and thus Costco may assert it

engaged in a good faith interactive process.  *See* CACI 2546 (listing essential elements of claim for failure to engage in good faith interactive process; elements include: "[t]hat [plaintiff] was willing to participate in an interactive process to determine whether reasonable accommodation could be made so that [he] would be able to perform the essential job requirements," "[t]hat [defendant] failed to participate in a timely good-faith interactive process with [plaintiff] to determine whether reasonable accommodation could be made," and "[t]hat [defendant] could have made a reasonable accommodation when the interactive process should have taken place").  But this is an issue for the jury.

Accordingly, the Court denies Costco's motion for summary judgment as to the accommodation claims (other than the time bar discussed above).

E.     Count 7: Wrongful Termination in Violation of Public Policy

Mr. Head's second claim for wrongful termination in violation of public policy (Count 7) is predicated on his FEHA claims.  This claim survives only to the extent the Court has permitted the accommodation claim above to survive.

F.     Request for Punitive Damages

Because the Court has not dismissed all of Mr. Head's employment discrimination claims, it must now address Costco's argument on punitive damages.  Costco asserts that, even if some employment discrimination claims survive, that still does not mean Mr. Head is entitled to punitive damages.  Costco argues that it should be granted summary judgment on any claim for punitive damages because no reasonable jury could find such damages appropriate based on the evidence of record.

Punitive damages may be awarded in a FEHA case pursuant to California Civil Code § 3294.  *See Myers v. Trendwest Resorts, Inc.*, 148 Cal. App. 4th 1403, 1435 (2007).  Section 3294(a) provides that punitives may be awarded where the plaintiff "by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice."  Cal. Civ. Code § 3294(a).  Section 3294(b) provides that, where there is a corporate employer, the misconduct must have been "on the part of an officer, director, or managing agent of the corporation."  *Id.* § 3294(b).

1   The Court agrees with Costco that no reasonable jury would award punitive damages,

2   particularly in light of the applicable clear-and-convincing standard.

3           Under the clear and convincing standard, the evidence must be so
            clear as to leave no substantial doubt and sufficiently strong to
4           command the unhesitating assent of every reasonable mind.
            Although the clear and convincing evidentiary standard is a stringent
5           one, it does not impose on a plaintiff the obligation to prove a case
            for punitive damages at summary judgment [or summary
6           adjudication].  Even so, where the plaintiff's ultimate burden of
            proof will be by clear and convincing evidence, the higher standard
7           of proof must be taken into account in ruling on a motion for
            summary judgment or summary adjudication, since if a plaintiff is to
8           prevail on a claim for punitive damages, it will be necessary that the
            evidence presented meet the higher evidentiary standard.

9

10  *Butte Fire Cases*, 24 Cal. App. 5th 1150, 1158-1159 (2018) (internal quotation marks omitted).

11          Here, even if a reasonable jury might well find that Costco failed to accommodate Mr.

12  Head by giving him additional leave to care for his wife, no reasonable jury would find that such

13  conduct warrants punitive damages.  The record reflects that: (1) Costco gave Mr. Head the full

14  leave he was entitled to under the FMLA/CFRA (*i.e.*, based on his wife's medical condition); (2)

15  because of this leave combined with leave for his own medical situation, Mr. Head was absent

16  from work for more than a year; (3) Mr. Head was asking for leave based on his wife's condition

17  that would continue his absence for another six months (taking all reasonable inferences in his

18  favor).; and (4) Costco afforded more leave time in toto to Mr. Head and his wife than required

19  under the FMLA and Costco's own leave policy.  Under these circumstances, no reasonable jury

20  could find that Costco was guilty of oppression, fraud, or malice in deciding to refuse further leave

21  resulting in Mr. Head's termination.

22          Accordingly, the Court grants Costco summary judgment on the claim for punitive

23  damages.

24  G.      Counts 9-16: Violations of Wage-and-Hour Law

25          As noted above, Mr. Head has asserted not only employment discrimination claims but

26  also a number of wage-and-hour claims: failure to pay minimum wages and/or overtime based on

27  off-the-clock work, meal and rest period violations, and derivative claims.

28

United States District Court
Northern District of California

1    1.    Statute of Limitations

2          As an initial matter, the Court should take note that Costco – apparently out of an

3    abundance of caution – emphasizes that the wage-and-hour claims should be subject to the

4    relevant statute of limitations.  Given that Mr. Head filed suit in January 2024, Costco argues that,

5    at most, Mr. Head can seek damages for the period January 2020 and on (*i.e.*, because the longest

6    wage-and-hour related limitations period is four years).  *See* Cal. Bus. & Prof. Code § 17208

7    (providing that a § 17200 claim has a four-year limitations period).  *Compare, e.g.*, *Murphy v.*

8    *Kenneth Cole Prods., Inc.*, 40 Cal. 4th 1094, 1114 (2007) (holding that meal break claims are

9    subject to a three-year limitations period pursuant to California Code of Civil Procedure § 338(a),

10   which covers an action upon a liability created by statute (other than penalty or forfeiture));

11   *Franco v. Mike's Cleaning Serv.*, No. 30-2020-01157156-CU-WT-CJC, 2021 Cal. Super. LEXIS

12   60585, at *5 (Orange Cty. Super. Ct. June 30, 2021) (stating that the statute of limitations for an

13   overtime claim is three years pursuant to § 338(a)).

14         In his opposition, Mr. Head does not dispute that his claims are subject to statutes of

15   limitations.  Nor does he assert that, *e.g.*, conduct prior to January 2020 is actionable.  *See* Opp'n

16   at 23 ("As Plaintiff worked his last shift for Costco on March 14, 2021 and received his final

17   paycheck after resigning on July 1, 2022, there is no doubt that at least some of those labor code

18   violations occurred within these statutory periods.").  Thus, at the end of the day, there is no

19   statute-of-limitations dispute for the wage-and-hour claims.

20   2.    Failure to Compensate for Off-the-Clock Work (Minimum Wage and Overtime)

21         and for Work Done During Interrupted Meal and Rest Breaks

22         Mr. Head's main wage-and-hour claims are for (1) failure to pay for off-the-clock work

23   (minimum wage and overtime) and (2) failure to pay for work done during interrupted meal and

24   rest breaks.

25         • The minimum wage/overtime claim depends on actual or constructive knowledge

26           on the part of Costco that Mr. Head was working off-the-clock.  *See Morillion v.*

27           *Royal Packing Co.*, 22 Cal. 4th 575, 585 (2000) (following federal law (the FLSA)

28           in holding that work not requested but suffered or permitted is work time; this

*United States District Court*
*Northern District of California*

1    means, *e.g.*, that an employer who knows or should have known that an employee

2    is or was working overtime must comply with overtime law).

3    &bull;  For meal and rest break claims, an employer is required to provide meal and rest

4    periods – *i.e.*, must relieve the employee of all duty for that time – but it does not

5    have to ensure that the employee does no work. *See Brinker Rest. Corp. v. Super.*

6    *Ct.*, 53 Cal. 4th 1004, 1040 (2012) ("An employer's duty with respect to meal

7    breaks . . . is an obligation to provide a meal period to its employees. The

8    employer satisfies this obligation if it relieves its employees of all duty,

9    relinquishes control over their activities and permits them a reasonable opportunity

10    to take an uninterrupted 30-minute break, and does not impede or discourage them

11    from doing so. . . . [¶] On the other hand, the employer is not obligated to police

12    meal breaks and ensure no work thereafter is performed.").

13    In the instant case, Mr. Head claims he was forced to do off-the-clock work because

14 managers "often instructed him to perform work for them before he had a chance to clock in and

15 after they knew he had clocked out for the day." Opp'n at 23. Similarly, Mr. Head asserts meal

16 and rest break violations because managers compelled him to do work while he was clocked out

17 for meal and rest breaks. *See* Opp'n at 24 ("Plaintiff had to perform work during his meal and rest

18 breaks, without being expected to clock back in on Costco's timekeeping system.").

19    Costco has two main arguments:

20    (1)  Mr. Head was paid for his alleged "compelled" work as demonstrated by the fact

21    that, *e.g.*, he was paid overtime on several occasions and that, whenever his time

22    records did not show a "facially compliant meal period," he was paid a meal period

23    premium, Mot. at 22-23 (adding that, "throughout Plaintiff's career, Costco

24    disciplined him for his failure to abide by Costco's timekeeping policies")

25    (emphasis omitted); and

26    (2)  Mr. Head has simply made vague, conclusory assertions that he was often

27    compelled to do work and has not provided any information about specific

28    incidents in which this happened, *i.e.*, so that damages could be calculated.

United States District Court

Northern District of California

United States District Court
Northern District of California

1    The first argument is not compelling.  Even if there were occasions when Mr. Head was

2  compensated for overtime or paid a meal period premium, that does not mean that Mr. Head was

3  *always* properly paid for his compelled work.  It can reasonably be inferred from Mr. Head's

4  deposition testimony that managers often imposed on his time when he was not on the clock.  *See,*

5  *e.g.*, Head Depo. at 227 ("There are many times when I'd be on my lunch break and a supervisor

6  would come in and ask, help to find something in lockup for a member.  And I would . . . help

7  because I wanted to get the member out. . . . [¶] And that kind of happened a lot.  I think most of

8  the supervisors there remember me as a salaried position, so they weren't mindful of my time.").

9    The second argument, however, has merit.  To be sure, this argument is not so much about

10  liability as about damages.  Nevertheless, that fact does not preclude summary judgment.  As the

11  plaintiff, Mr. Head has the burden of proving his damages.  If Mr. Head cannot provide any

12  evidence to prove up his damages, summary judgment is warranted.

13    In *Hernandez v. Mendoza*, 199 Cal. App. 3d 721 (1988), the state court addressed issues

14  related to proof of damages as follows:

15    Once an employee shows that he performed work for which he was
    not paid, the *fact* of damage is certain; the only uncertainty is the
16    *amount* of damage.  In such a case, it would be a perversion of
    justice to deny all relief to the injured person, thereby relieving the
17    wrongdoer from making any restitution for his wrongful act.

18  *Id.* at 726-27 (emphasis in original).  The court continued:

19    Although the employee has the burden of proving that he performed
    work for which he was not compensated, public policy prohibits
20    making that burden an impossible hurdle for the employee.
    "[W]here the employer's records are inaccurate or inadequate and
21    the employee cannot offer convincing substitutes a . . . difficult
    problem arises.  The solution, however, is not to penalize the
22    employee by denying him any recovery on the ground that he  is
    unable to prove the precise extent of uncompensated work.  Such a
23    result would place a premium on an employer's failure to keep
    proper records in conformity with his statutory duty; it would allow
24    the employer to keep the benefits of an employee's labors without
    paying due compensation . . . . In such a situation we hold that an
25    employee has carried out his burden if he proves that he has in fact
    performed work for which he was improperly compensated and if he
26    produces *sufficient evidence to show the amount and extent of that*
    *work as a matter of just and reasonable inference*.  The burden then
27    shifts to the employer to come forward with evidence of the precise
    amount of work performed or with evidence to negative the
28    reasonableness of the inference to be drawn from the employee's

> evidence.  If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate."

*Id.* at 727 (emphasis added); *see also Furry v. E. Bay Publ'g, LLC*, 30 Cal. App. 5th 1072, 1079 (2018) (following the *Hernandez* approach).

This Court applied the *Hernandez* approach in *Hurst v. Buczek Enterprises*, LLC, 870 F. Supp. 2d 810 (N.D. Cal. 2012) (Chen, J.).  At summary judgment, the Court addressed the plaintiff's overtime claim as follows:

> Here, Plaintiff states that he routinely worked more than eight hours per day and sometimes worked 12-16 hours per day.  Hurst Decl., Docket No. 45, ¶ 24.  More specifically, he states that he typically worked from 6:00 a.m. until 5:00 p.m., and frequently again from 8:00 until 10:00 or 11:00 p.m.  Id.  Buczek confirmed in deposition that Plaintiff worked up to seven days per week.  Buczek Depo. at 68.  Buczek has not carried its burden of demonstrating the absence of a genuine issue of fact on this question.  *See* Hernandez, 199 Cal. App. 3d at 727 (accepting as sufficient evidence testimony "that on most days from November 1983 through July 1984 he was required to be on his employers' premises from 8 a.m. until 9 p.m. or during the store's regular hours").  In addition, Buczek's work system may offer a reasonable basis for a jury to infer Plaintiff's overtime hours. Buczek may be able to attack any overtime award at a later date based on the quality of evidence presented at trial, but summary judgment does not appear warranted.  *Id.* at 726-27 ("Once an employee shows that he performed work for which he was not paid, the fact of damage is certain; the only uncertainty is the amount of damage. In such a case, it would be a perversion of justice to deny all relief to the injured person, thereby relieving the wrongdoer from making any restitution for his wrongful act.") (internal citations omitted) (emphasis in original).

*Id.* at 828.

*Hernandez* and *Hurst* indicate that there is a relatively low bar for a plaintiff at summary judgment.  Nevertheless, Mr. Head has, in the case at bar, failed to present sufficient evidence from which a jury could reasonably infer how much off-the-clock work Mr. Head did, including off-the-clock work done during meal and rest periods.  Mr. Head's deposition testimony is too vague on these points.  *See, e.g.*, Head Depo. at 76 (testifying that "a lot of times, the managers would throw me the keys and expect me to start early"); Head Depo. at 227 (testifying that "[t]here are many times when I'd be on my lunch break and a supervisor would come in and ask, help to find something in lockup for a member[;] [a]nd I would – you know, I would help because I wanted to get the member out").  Mr. Head could easily have provided more specific testimony

43

United States District Court
Northern District of California

1  in his declaration, but he did not.  *See, e.g.*, Head Decl. ¶ 11 ("My managers and supervisors

2  knowingly interrupted my meal and rest breaks also all the way up until I took continuous leave to

3  care for my wife in or about March 2021.").  Notably, he did not even make claims, as he did in

4  his complaint, that he "regularly" worked off-the-clock time.  Compl. ¶¶ 118-19.  Unlike *Hurst*,

5  there is no evidence Mr. Head worked "routinely" off-the-clock.  In light of this fundamental

6  deficiency, Costco is entitled to summary judgment.

7      In his opposition brief, Mr. Head raises two new theories on his wage-and-hour claims –

8  possibly in recognition of the deficiencies with his claims.  Both of these theories relate to whether

9  Mr. Head was paid the correct rate of pay:

10      (1) "Plaintiff was paid at a higher rate of pay for work he performed on Sundays, yet

11          his overtime rate stayed at 1.5 times his typical rate of pay" – *i.e.*, "[e]ven when

12          Plaintiff performs overtime on Sunday, that overtime is paid at the same rate of 1.5

13          times his typical rate of pay."  Opp'n at 24.

14      (2) When Mr. Head worked on Sundays, "his meal period premium rate was the same

15          as his typical rate of pay, [not] taking [the Sunday] higher pay rate into account."

16          Opp'n at 24.

17  Because these new theories are being articulated for the first time at summary judgment, the Court

18  does not entertain them.  They are waived.  In any event, these assertions say nothing about the

19  frequency of his having to work off-the-clock, the element missing here.

20                          **III.        CONCLUSION**

21      For the foregoing reasons, the Court grants in part and denies in part Costco's motion for

22  summary judgment.  The only claims that shall proceed to trial are:

23      • Failure to accommodate based on the disability of Mr. Head's wife, failure to

24          engage in the interactive process, and retaliation based on Mr. Head's

25          accommodation requests.

26      • Wrongful termination in violation of public policy as related to the failure to

27          accommodate.

28  The claims are limited to the alleged termination only.  Punitive damages are not available.

44

In light of the Court's rulings, the Court orders the parties to meet and confer to determine whether they wish to engage in further settlement discussions.  The parties shall report back within a week of the date of this order.

This order disposes of Docket No. 27.

**IT IS SO ORDERED**.

Dated: June 5, 2025

_____
EDWARD M. CHEN
United States District Judge